# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                          No. CR 10-1531 JB

HENRY JAGER,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States' Motion to Order the Defendant Into Custody at the Time of Sentencing, filed November 23, 2010 (Doc. 33); (ii) the Defendant's Motion for Downward Sentence Departure Pursuant to U.S.S.G. 5H1.11, filed November 24, 2010 (Doc. 35); (iii) the Defendant's Motion for Downward Sentence Variance, filed November 24, 2010 (Doc. 36); (iv) the Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender, filed November 24, 2010 (Doc. 37); (v) the Defendant's Objections to the Pre-Sentence Report and Sentencing Memorandum, filed November 24, 2010 (Doc. 38); (vi) the United States' Sentencing Memorandum and Recommendation, filed December 1, 2010 (Doc. 39); (vii) the Supplement to Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender, filed December 7, 2010 (Doc. 41); and (viii) the Second Supplement to Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender, filed December 9, 2010 (Doc. 42).  The Court held sentencing hearings on December 10, 2010 and December 13, 2010.  The primary issues are: (i) whether the court should grant Defendant Henry Jager a downward departure for his military service under U.S.S.G. § 5H1.11; (ii) whether the Court should vary downward based on Congress' alleged manipulation of U.S.S.G. § 2G2.2; (iii) whether the Court should grant Jager a variance

downward under the factors in 18 U.S.C. §3553(a); and (iv) whether the Court should allow Jager to voluntarily surrender.  For the reasons stated on the record at the hearings and for the reasons stated herein, the Court denies Jager a downward departure, grant Jager a variance, and sentences Jager to a term of 46 months in the custody of the Bureau of Prisons followed by lifetime supervised release.

## FACTUAL BACKGROUND

Jager is a thirty-four year old male with a high school education, who comes before this Court on a charge of Possession of Matter Containing Visual Depictions of Minors Engaged in Sexually Explicit Conduct ("child pornography"), in violation of 18 U.S.C. § 2252(a)(4)(B), 2252(b)(2), and 2256.  The United States Probation Office ("USPO") disclosed a Presentence Investigation Report on October 21, 2010.  The USPO re-disclosed the Presentence Investigation Report on November 16, 2010 ("PSR").  The following facts are based on the PSR.

### 1.     Jager's Consumption of Child Pornography.

The charge stems from an incident on September 15, 2009, when Immigration and Customs Enforcement ("ICE") Agents contacted Jager at his residence in Albuquerque, New Mexico.  PSR ¶ 8, at 4.  Before this contact, ICE Agents investigated users who were distributing and receiving child pornography images on the website www.free6.com.  See PSR at ¶ 7, at 3.  When ICE Agents contacted Jager at his residence, they informed him that they had information that he possessed child pornography and requested permission to search his computers.  See PSR ¶ 8, at 4.  Jager gave the agents permission to search his computers.  See PSR ¶ 8, at 4.  During the onsite forensic preview, ICE Agents found images depicting minors engaged in sexually explicit conduct.  See PSR ¶ 8, at 4.

ICE Agents asked to speak with Jager, to which Jager voluntarily agreed.  See PSR ¶ 9, at

4.  Jager admitted he was the only person to use the computers that contained the child pornography.  See PSR ¶ 9, at 4.  Jager admitted he had received his child pornography from the website www.free6.com approximately six months before the interview and from a person he knew as "Mike" through MSN Messenger.  PSR ¶ 12, at 5.  Jager admitted he began to view child pornography a few years earlier, in approximately 2005.  See PSR ¶ 9, at 4.  Jager also admitted that he may have posted child pornography images to the website www.free6.com.  See PSR ¶¶ 9, 11, at 4-5.

On October 13, 2009, Jager came to the Albuquerque ICE Office to participate in a polygraph regarding any hands-on sexual offense against children.  See PSR ¶¶ 23, 24, at 10-11.  After being advised of his Miranda[1] rights, Jager was asked "if he ever let a minor touch his penis after becoming an adult" and "if he touched the sexual organs of any minor since his 18th birthday."  PSR ¶ 23, at 10.  Jager answered "no" to each question, and the polygrapher determined Jager's responses were deceptive.  PSR ¶¶ 23, 24, at 10-11.  Upon further interview, Jager admitted that, while on active duty in South Korea between 2002 and 2003, and in Germany between 2003 and 2005, he went to clubs and paid to have sexual relations with numerous girls under the age of 18.  See PSR ¶ 24, at 11.  Jager also admitted he touched his young niece's buttocks and she touched his penis over his clothes.  See PSR ¶ 24, at 11.  Jager further admitted to being sexually aroused when his niece sat on his lap.  See PSR ¶ 24, at 11.  The niece was interviewed, but made no disclosure of sexual abuse.  See PSR ¶ 24, at 11.

In a subsequent interview with ICE on November 18, 2009, Jager was asked to provide additional information about his military tours and the clubs which afford minors for a sexual

_____

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

purpose.  See PSR ¶ 25, at 11.  Jager recanted his earlier statement that the prostitutes with whom

he had sexual relations in South Korea and Germany were underage.  See PSR ¶¶ 25-26, at 11-12.

Jager stated that he lied to the polygrapher about his sexual conduct involving children.  See PSR

¶ 27, at 12.  Jager denied ever having sexual contact with minors and told the agents that he said

what the investigators wanted to hear at the time.  See PSR ¶ 27, at 12.  While confirming that he

was aroused during the incident with his niece, Jager asserted that his niece inadvertently placed her

hand on his penis and that he "patted her butt playfully," and denied that he said he touched her

breast.  PSR ¶ 28, at 12.

On February 25, 2010, Jager participated in a tape-recorded statement with Kirtland Air

Force Investigators.  See PSR ¶¶ 15-16, at 6.  Jager admitted that he received and shared child

pornography using the internet, and that he began this criminal conduct a few years earlier.  See PSR

¶¶ 15-16, at 6.  Jager also admitted he became addicted to the images and constantly worried about

the consequences he might face if ever caught looking at these images.  See PSR ¶ 16, at 6.

A forensic examination of Jager's computers found numerous images and videos of child

pornography.  See PSR ¶ 17, at 7.  The National Center for Missing and Exploited Children

("NCMEC") confirmed Jager possessed 133 known, identified child pornography images from

thirty-one series and sixty-nine known, identified child pornography videos from fifteen different

series.  See PSR ¶ 17, at 7.  Based on Jager's admissions both to law enforcement and to a forensic

psychologist, Moss Aubrey, Ph.D., he was involved in the child pornography industry for years

before law-enforcement detection.  See PSR ¶ 9, at 4; Comprehensive Sex Offender Evaluation

Report at 9, filed November 24, 2010 (Doc. 38-1)("Aubrey Report").

   2.   **Military Service.**

Jager enlisted in the United States Air Force in March 1998.  See PSR ¶ 74, at 24.  Before

June 2008 -- when he underwent dynamic fusion surgery for a back injury -- Jager was an aircraft hydraulic system head technician.  See PSR ¶ 74, at 24.  In this capacity, he was a specialized mechanic, working on C-130 Hercules transport aircraft and CV-22 Osprey tilt-rotor aircraft.  See PSR ¶ 74, at 24.  More recently, Jager served as a C-22 Aircraft Maintenance Debriefer, with significant additional duties as a data processor and data integrity monitor.  See PSR ¶ 74, at 24.

Jager's Enlisted Performance Reports show consistent outstanding performance.  See PSR ¶¶ 75-77, at 24-28.  Jager's Enlisted Performance Reports between 1998 and 2009 consistently assigned Jager the highest or second highest rating available.  See PSR ¶ 75, at 24-25.[2]  His Enlisted Performance Reports provide the rater's comments, which include the following: (i) "[t]rue community leader"; (ii) "[d]ispatched to aircraft for hydraulic pressure fluctuation on #4 engine; isolated/replaced engine pump -- directly contributed to 1,156 hours/162 sorties flown/640 pax airlifted in support of Operation IRAQI FREEDOM"; (iii) "[o]utstanding airman; possesses degree of excellence rarely observed within peer group; promote ASAP"; (iv) [h]and-picked as elite member of PHOENIX BANNER support team; launched 28 msns -- 100% reliability"; and (v) "[c]ommitted to mission accomplishment; volunteered to work while off-duty; launched two HC-130P to in-flight refuel four HH-60s to support Hurricane Katrina rescue efforts; selflessness resulted in countless lives saved."  PSR ¶ 76, at 25-27.

In addition to the praise Jager received in his Enlisted Performance Reports, Jager also received numerous awards, service ribbons/medals, and commendations during his service.  See PSR ¶ 77, at 27-28.  Among his numerous awards and service ribbons, Jager was awarded the Air Force Achievement Medal for servicing a C-130 aircraft while the base was under fire.  See PSR

---

[2] The PSR did not include Jager's Enlisted Performance Report for the periods between November 4, 1999 and November 2, 2000, and between April 20, 2009 and April 19, 2010.

¶ 77, at 28.

## PROCEDURAL BACKGROUND

On May 26, 2010, a Grand Jury returned an Indictment charging Jager with two Counts of Receipt and/or Distribution Of A Visual Depiction of A Minor Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2) and 2256. See Doc. 2. Jager was arrested on June 1, 2010. See Doc. 15. On June 3, 2010, the Honorable Richard L. Puglisi, Magistrate Judge for the United States District Court for the District of New Mexico, released Jager pending trial on terms and conditions, including travel restrictions, prohibitions on the use of computers at home and on access to the internet from any computer, provisions for the search and monitoring of his computer, prohibitions on obtaining, viewing, or possessing any sexually explicit material, together with standard conditions of release. See Order Setting Conditions of Release, filed June 3, 2010 (Doc. 9). On September 10, 2010, Magistrate Judge Puglisi entered a second Order Setting Conditions of Release in this matter. See Doc. 27.

On September 10, 2010, Jager pled guilty to Count 1 of the Indictment, charging him with Receipt and/or Distribution of a Visual Depiction of A Minor Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2) and 2256. See Plea Agreement, filed September 10, 2010 (Doc. 25). In exchange for an agreement not to file charges of Receipt and/or Distribution Of A Visual Depiction of A Minor Engaged in Sexually Explicit Conduct, in violation of §§ 2252(a)(2), 2252(b)(2) and 2256, which carries a mandatory minimum term of imprisonment of 5 years, Jager agreed not to seek a downward departure or variance below 36 months imprisonment. See Plea Agreement at ¶ 10(g), at 7. Additionally, Jager agreed to waive his appellate rights in this matter. See Plea Agreement ¶ 21, at 11-12. Pursuant to the stipulations between the parties and the conclusions in the PSR, Jager's offense level -- after acceptance of

responsibility -- is 28, which, with Jager's criminal history category of I, carries a term of imprisonment of 78 to 97 months.  Plaintiff United States of America took no position on continued release pending sentencing.

      **1.**        **Motions Regarding Voluntary Surrender.**

On November 23, 2010, the United States filed its Motion to Order the Defendant into Custody at the Time of Sentencing.  See Doc. 33.  The United States requests that the Court order that Jager be taken into custody at the time of sentencing in this matter pursuant to 18 U.S.C. § 3143(a)(2).  The United States asserts that Jager has been convicted of a crime of violence, he is a danger to the community, and that he does not present exceptional circumstances to warrant his continued release after sentencing in this case pursuant to 18 U.S.C. §3143(a)(1).

On November 24, 2010, Jager filed his Motion for Post-Sentencing Release to Permit Voluntary Surrender.  See Doc. 37.  Jager moves the Court to continue his conditions of release post-sentencing pursuant to 18 U.S.C. § 3145(c).  He asserts that he is not a flight risk or dangerous, and that there are exceptional reasons why his immediate detention upon sentencing would not be appropriate.  Jager cites his compliance with his pre-trial conditions of release in support of his contention that he is not dangerous or likely to flee.  He also contends that his case presents exceptional circumstances justifying continued release on conditions to afford him the opportunity to voluntary surrender, because he has no criminal history, he complied with investigators, he obtained of his own initiative a comprehensive sex offender evaluation and counseling, and he has a distinguished military career.

Jager supplemented his request on December 7, 2010 with his Supplement to Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender.  See Doc. 41.  Jager informed the Court that, contrary to the representation in Jager's Motion for Post-Sentencing Release to

Permit Voluntary Surrender, he had not begun counseling, because of scheduling and resource constraints, and that he would be unable to begin counseling until December 16, 2010 -- after his scheduled sentencing.   On December 9, 2010, Jager further supplemented his request with his Second Supplement to Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender.  See Doc. 42.  Jager asserted that, if he is required to be taken into custody immediately after sentencing, he would be ineligible for a disability rating and lifelong disability benefits for this military service.

### 2.   Motions Regarding Downward Departures and Variances.

On November 24, 2010, Jager filed his Motion for Downward Sentence Departure Pursuant to U.S.S.G. 5H1.11.   See Doc. 35.   Jager requests that the Court depart downward from the applicable sentencing guidelines offense level on the grounds that his military service takes him outside of the heartland of cases.   Jager contends that his military service, alone and in combination with other offender characteristics, is present to an unusual degree, and distinguishes his case from the typical cases covered by the sentencing guidelines.   See U.S.S.G. § 5H1.11.   That same day, Jager filed his Motion for Downward Sentence Variance.   See Doc. 36.   Jager concurrently filed his Objections to the Pre-sentence Report and Sentencing Memorandum in support of his motions for a variance and a downward departure.   See Doc. 38 ("Sentencing Memorandum").   Jager requests that the Court impose a sentence of no more than 36 months of incarceration, impose no fine, permit his voluntary surrender to a  Bureau or Prisons facility, and enter a restitution order in the amount of $500.00 pursuant to the parties' agreement.

On December 1, 2010, the United States filed its Sentencing Memorandum and Recommendation.   See Doc. 39.  The United States request that the Court impose a sentence of 78 months, at the low end of the applicable guideline calculation.  The United States further requests

the Court impose a lengthy term of supervised release.  The United States contends that the sentencing guidelines' range, while advisory, is appropriate in this case, and that a variance is not warranted.

**3.     Jager's Objections to the PSR.**

In his Sentencing Memorandum, Jager also submits objections and requests the Court make corrections to the PSR.  Jager objects to the inclusion of paragraphs 24 to 29 in their entirety as unreliable and unproven, and as too remote in time to the conduct for which he is charged. Paragraphs 24 to 29 recite Jager's admissions and subsequent recantations about using child prostitutes in South Korea and Germany, and the incident with his niece.  Jager contends that the information and assertions in the paragraphs do not rise to the level of circumstances affecting his behavior which may be helpful in imposing sentence or in correctional treatment.

Jager voluntarily submitted to a psychological evaluation with Dr. Aubrey for the purpose of assessing his mental treatment needs, his amenability to treatment, and his risk of re-offending. The result of this evaluation was a Comprehensive Sex Offender Evaluation Report.  Jager objects to including a portion of Dr. Aubrey's clinical impressions in paragraph 62 of the PSR on the grounds that the included text is an incomplete paragraph and can be misinterpreted standing alone. Jager contends that the language missing from the PSR is important, because it allegedly makes clear that Jager's commonality in thinking, emotions, and behavior in comparison with adult men who have sexually molested children does not mean he also has a sexual interest in children or sexually offensive behavior.  Jager requests that the PSR be amended to include the full text of the quoted paragraph, which states:

> Finally, there is a scale on this test which compares some of the Defendant's responses to test items to those of a reference group of convicted child molesters. The test items used for this comparison have no evident bearing on sexual interest

in children or sexually offensive behavior, and they are more in regards to general emotional and psychological functioning. <u>Mr. Jager is categorized as having a high level of commonality in thinking, emotions, and behavior in comparison with adult men who have sexually molested children. This does not indicate that he himself has molested a child; it does indicate that his psychological issues that contributed to his sexual arousal towards images of children are well established and will need to be addressed in a program of rehabilitation.</u>

Aubrey Report at 13-14 (the PSR contains only the underlined text).

### 4. **Dr. Aubrey's Report.**

Jager attached Dr. Aubrey's report to his Sentencing Memorandum.  Dr. Aubrey found that Jager meets the diagnostic criteria for ephebophilia, a clinical condition in which a person is sexually aroused by pubescent adolescents.  He did not diagnose him with pedophilia, a clinical condition in which a person is sexually aroused by prepubescent children.  The specifiers of ephebophilia are: opposite-sex type, non-incestuous, and non-exclusive.  The specifiers indicate his sexual interest is relatively focused on adolescent females, but he also continues to experience sexual interest and activity with adult females.  <u>See</u> Aubrey Report at 15.

In terms of dangerousness to the community, it is Dr. Aubrey's opinion that Jager can be safely placed on probationary supervision, and his risk level is lower than the majority of sex offenders who are on probationary supervision, either though the federal courts or through the state district courts.  <u>See</u> Aubrey Report at 19; PSR ¶ 63, at 21-22.  Dr. Aubrey also found that Jager has above average motivation to engage in treatment, that he feels guilty for his conduct, and that he has developed an appreciation that the children in the images he possessed were victimized and suffered harm.  <u>See</u> Aubrey Report at 13; PSR ¶ 62, at 21.

Despite Jager's contention that he lied to the polygrapher in his interview with Dr. Aubrey months later, he admitted to becoming sexually aroused while his niece sat on his lap.  <u>See</u> Aubrey Report at 4.  Jager stated, however, that the arousal was because of a movie.  <u>See</u> Aubrey Report at

-10-

4.  Jager also acknowledged that his niece touched his penis through his clothing, but asserted that the contact was accidental.  See id.

Dr. Aubrey indicated Jager presents a "low-moderate risk of recidivism."  Aubrey Report at 18.  Dr. Aubrey's report does not fully deal with the polygraph and Jager's initial incriminating statements to law enforcement about his sexual conduct with children.  See Aubrey Report at 5, 17-18.  Dr. Aubrey's report described the military tour/club incidents, and summarized "that the polygraph was not conducted in the most objective and impartial manner."  Aubrey Report at 5.  Rather, Dr. Aubrey suggested the issue of hands-on conduct should be resolved after disposition of this case and upon Jager's enrollment in treatment.  See id. at 5.  Dr. Aubrey's report suggested that additional issues must be explored, such as "his deviant sexual interest; his intermittent symptoms of anxiety and depression; his past alcohol abuse problems; his reported past suicidal issues; and the discrepancies between his account and what he has been accused of doing based on the ICE investigation."  Aubrey Report at 17.

Dr. Aubrey previously recognized in the Dominic Akers case that experts can only speculate whether a person will reoffend.  See Katie Burford, Theater Killing Suspect Had Troubles as Teen, Albuquerque Journal, July 26, 2003, at A1.  In 2003, Akers faced murder and kidnaping charges in the death of a sixteen-year-old female whom he strangled at the Sunshine Theater in Albuquerque while he worked as a janitor.  Before this crime, Akers had been sentenced for sexually abusing a four-year-old girl, in which Dr. Aubrey found Akers presented a moderate risk of recidivism.  When interviewed after the murder, Dr. Aubrey is reported to have stated that "even experts can only speculate about a person's capacity for future violence."  Burford, supra at A1.

**4.  The Hearings.**

At the December 10, 2010 hearing, the Court heard testimony from ICE Senior Special

Agent Sonny Garcia, the polygrapher who interviewed Jager on October 13, 2009.  Garcia stated that he has performed thousands of polygraph tests, and that the federal government has trained and accredited him.  Garcia acknowledges that polygraphy is an inexact science.  Garcia stated that Jager completed a consent form, which stated that he could terminate that polygraph examination at any time.  See Jager's Polygraph Examination Statement of Consent (dated October 13, 2009)(Gov't Ex. 7)("I also understand that I do not have to submit to an interview or Polygraph Examination and that even after consenting to do so, I can withdraw my consent and stop the interview and Polygraph Examination at any time.").  Garcia testified that Jager's negative response to the questions, "have you let a minor touch your penis since becoming an adult?" and "[h]ave you touched the sexual organs of a minor since your eighteenth birthday" indicated deception.  Transcript of Hearing at 17:5-11 (taken December 10, 2010)(Rees, Garcia)("Tr.").[3]  When Garcia confronted Jager about the results, and asked Jager open-ended questions whether he had sexual encounters with minor, Jager told Garcia that he had sexual relations with child prostitutes in South Korea and Germany.  Jager also told Garcia that, on numerous occasions, when he visited his niece, he would become sexually excited when she sat on his lap, and that she had touched his penis over his clothing, and he touched her butt and breast outside of her clothing.

Dr. Aubrey also testified at the December 10, 2010 hearing.  The United States stipulated that Dr. Aubrey is an expert in the areas of clinical psychology, forensic psychology, and the evaluation of sex offenders.  He has evaluated over 3,000 individuals, including over 1,600 sex offender evaluations.  Dr. Aubrey assessed Jager to present a low to moderate risk of future dangerousness.  Dr. Aubrey stated that he "didn't really come to a good conclusion about what

---

[3] The Court's citations to transcripts of hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

actually to make of" Jager's contradictory accounts whether he had sexual contact with minors, and that those issues could be explored using a polygraph during treatment. Tr. at 52:18-53:4 (Aubrey). Dr. Aubrey stated Jager expressed interest in adult and older adolescent females, and not in prepubescent females or males of any age. See id. at 62:16-20, 64:5-6 (Aubrey). Dr. Aubrey stated that the instruments he used to predict Jager's likelihood of recidivism have an accuracy of seventy-five to eighty percent. See id. at 69:11-14 (Aubrey). Based on his assessment of Jager, Dr. Aubrey concluded that Jager needs treatment for his sexual problem, and that Jager could be rehabilitated in the community on an outpatient basis or in a treatment program in a correctional facility.

On cross examination, Dr. Aubrey acknowledged that risk assessment is not a perfect science, is an evolving field, and involves speculation. See Tr. at 104:4-106:5 (Rees, Aubrey). Dr. Aubrey also conceded that he did not review the images from Jager's computer, and that he instead relied on Jager's and NCMEC's description of the images as depicting primarily adolescents. See Tr. at 80:6-8 (Rees, Aubrey). Upon reviewing a sample of the images on the stand, Dr. Aubrey acknowledged that some of the images were of prepubescent girls. See Tr. at 101:15-18 (Rees, Aubrey). Dr. Aubrey also acknowledged that Jager concealed his consumption of child pornography and that police had seized his computer from his girlfriend, which possibly suggests that he is more dangerous. See Tr. at 84:19-85:8 (Rees, Aubrey). Dr. Aubrey further acknowledged that an individual who engages in hands-on sexual abuse of minors presents a higher risk of recidivism than someone who only consumes chid pornography. See Tr. at 123:16-19 (Rees, Aubrey).

ICE Senior Special Agent Christine Britat testified that attempts to follow up on Jager's admissions of using child prostitutes and incidents with his niece were unsuccessful. See Transcript of Hearing at 4:24-6:10 (taken December 13, 2010)(Rees, Britat)("Second Tr."). She also reviewed the child pornography found on Jager's computer and found that it included images of prepubescent

girls.  See Second Tr. at 6:11-23 (Rees, Britat).  She estimated that approximately thirty-six percent of the images involved some kind of sexual activity.  See Second Tr. at 7:23-25 (Britat).

## ANALYSIS

Jager requests a sentence of 36 months.  The United States requests a sentence at the low end of the guideline range of 78 months followed by five years of supervised release.  The Court sentences Jager to a term of 46 months in the custody of the Bureau of Prisons followed by lifetime supervised release.

## I.    THE COURT OVERRULES JAGER'S OBJECTIONS TO THE PSR.

Jager objects to a number of paragraphs in the PSR.  He objects to the inclusion of information relating to his admissions and recantations of having sexual contact with minors in paragraphs 24 through 29.  He also objects to including only part of Dr. Aubrey's clinical impressions in paragraphs 62 of the PSR.  The Court overrules Jager's objections to paragraphs 24 through 29, and sustains his objections to paragraphs 62.

### A.    THE COURT OVERRULES JAGER'S OBJECTION TO PARAGRAPHS 24 THROUGH 29.

Paragraphs 24 through 29 of the PSR pertain to Jager's admissions and subsequent denials that he had sexual contact with child prostitutes and his niece.  Jager objects to the inclusion of paragraphs 24 through 29 "in their entirety as unreliable and unproven, and too remote in time to the offense conduct; the information and assertions therein do not rise to the level of circumstances affecting defendant's behavior that may be helpful in imposing sentence or in correctional treatment."  Sentencing Memorandum at 2-3.  Jager also denies paying for or engaging underage prostitutes while he was based in South Korea, Germany, or elsewhere.  He further denies any incidents involving his niece where he became sexually aroused when his niece inadvertently

-14-

placing her hand on him.  The United States responds that the facts are relevant to Jager's dangerousness and that the Court may appropriately consider them when determining an appropriate sentence.

Given the discrepancies in Jager's statements, the Court believes the information contained in paragraphs 24-29 speaks to Jager's background, character, and conduct.  It was appropriate for the USPO to include this information for the Court to use in determining an appropriate sentence in accordance with 18 U.S.C. § 3661.  "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  Also, given the breadth of the factors that Congress has set forth in 18 U.S.C. § 3553(a) for the Court to consider, it is difficult to imagine how the Court could categorically exclude from consideration any evidence.  In any case, the Court may consider relevant conduct in determining an appropriate sentence and whether Jager has had sexual contact with children is relevant conduct.  Because polygraphy is an inexact science, the Court finds Jager's statements to Garcia more relevant than Garcia's finding that the polygraph indicated deception.  Jager's assertion that he told Garcia only what he wanted so as to end the interview lacks force, because Jager was free to terminate the interview with Garcia at any time, and his statements were in response to Garcia's open-ended questions.  The Court therefore will not order amendment of paragraphs 24 through 29, or order them deleted from the PSR.

### B.     THE COURT WILL SUSTAIN JAGER'S OBJECTION TO PARAGRAPH 62.

Jager objects to the second portion of Dr. Aubrey's clinical impressions in paragraph 62 on the grounds that the quoted text is an incomplete paragraph and can be misinterpreted standing alone.  Jager requests that the Court amend the PSR to include the full text of the quoted paragraph,

which states:

> Finally, there is a scale on this test which compares some of the Defendant's responses to test items to those of a reference group of convicted child molesters. The test items used for this comparison have no evident bearing on sexual interest in children or sexually offensive behavior, and they are more in regards to general emotional and psychological functioning. <u>Mr. Jager is categorized as having a high level of commonality in thinking, emotions, and behavior in comparison with adult men who have sexually molested children. This does not indicate that he himself has molested a child; it does indicate that his psychological issues that contributed to his sexual arousal towards images of children are well established and will need to be addressed in a program of rehabilitation.</u>

Aubrey Report at 13-14 (the PSR contains only the underlined text). Jager contends that the omitted language is necessary, because the two sentences make clear that Jager's commonality in thinking, emotions, and behavior in comparison with adult men who have sexually molested children does not mean he also has a sexual interest in children or sexually offensive behavior. The United States does not object to including the entire paragraph from Dr. Aubrey's report. The Court grants Jager's request that the PSR include the entire paragraph.

## C.    THE COURT ADOPTS THE SENTENCING GUIDELINE CALCULATIONS IN THE PSR AS ITS OWN.

The parties have no objection to the calculation of the sentencing guideline range pursuant to U.S.S.G. § 2G2.2, as set forth in the PSR at paragraphs 35 through 46. Jager agrees that, pursuant to the stipulations in the plea agreement, his total offense level is 28, and his criminal history category is I, resulting in a guideline range of 78 to 97 months. There being no objection to the sentencing guideline calculations in the PSR, the Court adopts them as its own. The Court notes that Jager possessed at least 133 known images and at least sixty-nine known videos containing a visual depiction of minors engaged in sexually explicit conduct.

## II.    THE COURT DENIES JAGER A DOWNWARD DEPARTURE, BUT GRANTS JAGER A VARIANCE.

The Court denies Jager a downward departure for his military service.  The Court also denies Jager's request that it grant him a variance downward because of Congress' manipulation of the sentencing guidelines in U.S.S.G. § 2G2.2.  The Court grants Jager a variance downward based on balancing the factors in 18 U.S.C. §3553(a).

### A.    THE COURT WILL NOT DEPART DOWNWARD UNDER THE GUIDELINES BECAUSE OF JAGER'S MILITARY SERVICE.

Jager requests that the Court depart downward from the applicable sentencing guidelines offense level on the grounds that Jager's military service, by itself and in combination with other offender characteristics, is present to an unusual degree, and distinguishes his case from those that the sentencing guidelines were meant to cover.  Jager has attained the rank of E-5 Staff Sergeant. Jager contends that he did more than serve one or two enlistment periods; he made a career of the military.  He has -- except for this crime -- been an outstanding airman who has served with honor and distinction, including service in a combat zone during Operation Iraqi Freedom.  But for his conduct leading to these criminal proceedings, he had a career track with the United States Air Force, and he may well have advanced to senior NCO status.

The United States opposes granting Jager a downward departure for his military service.  The United States notes that Jager may have engaged in sexual contact with child prostitutes while deployed abroad, tainting whatever service he has provided.  The United States further asserts that those responsible for awarding Jager his commendations and accolades may not have done so if they had been aware of Jager's criminal activities.

Jager's military service demonstrates dedication and excellence.  The question is whether his dedication and excellence are present to such an unusual degree that the Court should depart

downward.  U.S.S.G. § 5H1.11 provides, in relevant part: "Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  The Court must decide whether Jager's dedication and excellence distinguishes his case from other cases that the guidelines cover.  Jager has exhibited trustworthiness, dedication, and distinction, and with the exception of this criminal activity, he largely went about his tasks on behalf of the United States with integrity.  Jager did not serve just one or two terms, but made a career out of the military.  His reviews, commendations, medals, and the letters from his peers reveal exemplary service.  His service, however, is tarnished.  He once admitted that, during his deployment in South Korea and Germany, he had sexual contact with child prostitutes.  While he was stationed at Kirtland Air Force Base, he consumed child pornography.

The Court believes that a departure is authorized in this case, and that the guidelines provide a departure based upon military service given the appropriate circumstances.  One factor the Court must consider, however, is that often in child pornography cases the defendant lives a double life, as Jager has lived here.  Jager is not unlike many of the men who engage in this crime.  Oftentimes, they have no other criminal record.  Oftentimes, they are outstanding and upstanding members of our society, but they live a secret life.  The Court, consequently, has trouble squaring Jager's excellent military record with the crime here.  Because Jager's circumstances fall into a pattern the federal courts encounter with some frequency, the Court does not think this case falls outside the heartland of cases.  The Court's conclusion is the same whether it considers Jager's military service alone, or in combination with his other factors and circumstances.

Furthermore, Jager's military service, while exemplary, is not one of intense combat.  While it appears that he once was under fire, for the most part, it appears he did his service in support roles.

-18-

While the military depends upon those in support roles, and the Court's mention of this aspect of his service does not diminish his service in any way, the Court nonetheless does not believe his military service is so exceptional that the Court should depart downward.

The Court thus denies Jager a downward departure, because a departure is not warranted under the facts and circumstances presented by this case.  Unfortunately, our prisons contain men who are outstanding people in society but have committed this crime.  The Court has trouble distinguishing Jager's case from many others concerning child pornography.  Although a departure is authorized, the Court will exercise its discretion not to depart.  The Court finds this case remains in the heartland of cases, particularly chid-pornography-possession cases.  The Court, consequently, does not believe that Jager's military service supports a downward departure.  The Court will, however, consider Jager's military service when deciding whether a variance is warranted.

## B.   THE COURT DOES NOT HAVE A FUNDAMENTAL DISAGREEMENT WITH U.S.S.G. § 2G2.2 THAT WOULD CAUSE THE COURT TO VARY.

Jager contends that U.S.S.G. § 2G2.2 does not reflect the United States Sentencing Commission's empirical analysis and institutional expertise.  U.S.S.G. § 2G2.2 states:

(a) Base Offense Level:

> (1) 18, if the defendant is convicted of 18 U.S.C. § 1466A(b), § 2252(a)(4), § 2252A(a)(5), or § 2252A(a)(7).

> (2) 22, otherwise.

(b) Specific Offense Characteristics

> (1) If (A) subsection (a)(2) applies; (B) the defendant's conduct was limited to the receipt or solicitation of material involving the sexual exploitation of a minor; and (C) the defendant did not intend to traffic in, or distribute, such material, decrease by 2 levels.

> (2) If the material involved a prepubescent minor or a minor who had not attained the age of 12 years, increase by 2 levels.

(3) (Apply the greatest) If the offense involved:

    (A) Distribution for pecuniary gain, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the retail value of the material, but by not less than 5 levels.

    (B) Distribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain, increase by 5 levels.

    (C) Distribution to a minor, increase by 5 levels.

    (D) Distribution to a minor that was intended to persuade, induce, entice, or coerce the minor to engage in any illegal activity, other than illegal activity covered under subdivision (E), increase by 6 levels.

    (E) Distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct, increase by 7 levels.

    (F) Distribution other than distribution described in subdivisions (A) through (E), increase by 2 levels.

(4) If the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, increase by 4 levels.

(5) If the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, increase by 5 levels.

(6) If the offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material, increase by 2 levels.

(7) If the offense involved--

    (A) at least 10 images, but fewer than 150, increase by 2 levels;

    (B) at least 150 images, but fewer than 300, increase by 3 levels;

    (C) at least 300 images, but fewer than 600, increase by 4 levels; and

    (D) 600 or more images, increase by 5 levels.

(c) Cross Reference

> (1) If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, apply § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above.

U.S.S.G. § 2G2.2. Jager contends that U.S.S.G. § 2G2.2 is the product of Congressional manipulation that interferes with and undermines the Sentencing Commission's work, because the guideline does not reflect empirical analysis. See United States v. Shipley, 560 F. Supp. 2d 739, 744-45 (S.D. Iowa 2008)(collecting cases questioning the severity of child pornography guidelines and asserting that "a guideline is not a statute. . . . [I]f Congress does not want the courts to try and sentence individual defendants throughout that range based on the facts and circumstances of each case, then Congress should amend the statute, rather than manipulate an advisory guideline and blunt the effectiveness and reliability of the work of the Sentencing Commission."). Jager contends that U.S.S.G. § 2G2.2 is not a reliable indicator of the Sentencing Commission's perspective on a fair sentence for given offense conduct, such as that present in his case.

> Sentencing Guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. See Rita v. U.S., 551 U.S. 338 . . . (2007). However, the Commission did not use this empirical approach in formulating the Guidelines for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties. See United States Sentencing Commission, The History of the Child Pornography Guidelines, Oct. 2009, available at http:// www. ussc. gov/ general/ 20091030_ History_ Child_ Pornography_ Guidelines. pdf (last visited April 19, 2010). Alan Vinegrad, the former United States Attorney for the Eastern District of New York, has noted that the recent changes effected by the PROTECT Act of 2003 evince a "blatant" disregard for the Commission and are "the most significant effort to marginalize the role of the Sentencing Commission in the

federal sentencing process since the Commission was created by Congress," as Congress:

> (i) adopted sentencing reforms without consulting the Commission, (ii) ignored the statutorily-prescribed process for creating guideline amendments, (iii) amended the Guidelines directly through legislation, (iv) required that sentencing data be furnished directly to Congress rather than to the Commission, (v) directed the Commission to reduce the frequency of downward departures regardless of the Commission's view of the necessity of such a measure, and (vi) prohibited the Commission from promulgating any new downward departure guidelines for the next two years.

Alan Vinegrad, The New Federal Sentencing Law, 15 Fed. Sent. R. 310, 315 (June 2003). The PROTECT Act of 2003 was the first instance since the inception of the Guidelines where Congress directly amended the Guidelines Manual. See United States Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, 2004, at 72, available at http:// www. ussc. gov/ 15_ year/ chap 2. pdf (last visited April 15, 2010).

United States v. Dorvee, 616 F.3d 174, 184-85 (2d Cir. 2010)(footnote omitted).

The Court will not reject U.S.S.G. § 2G2.2 on categorical, policy grounds. For the reasons stated on the record at the December 13, 2010 hearing, and reasons consistent with those reasons, the Court will not vary downward because of congressional manipulation of U.S.S.G. § 2G2.2. The Court believes it should take seriously Congress' intent to punish severely these cases. Congress is not required to support its expressions of its intent with empirical research, including its condemnation of the consumption of chid pornography.

Although U.S.S.G. § 2G2.2 may produce harsh sentences, the Court believes that the solution is not to reject the guideline wholesale, but to look at the individual that is before the Court. The Court believes that the parameters which Congress and the Sentencing Commission have set forth in the sentencing guidelines are appropriate. District judges should be slow to set them aside in whole and disregard them entirely because they are not based on empirical data, because so dealing

with them is likely only to encourage Congress to pass mandatory minimums which would deny courts the ability to treat each individual defendant as an individual and tailor a sentence that is appropriate for that defendant.

### C.   THE COURT WILL GRANT JAGER A VARIANCE DOWNWARD UNDER THE FACTORS IN 18 U.S.C. §3553(a).

The Court has, as the record of the two-day hearing reflects, carefully considered the guidelines, but in arriving at its sentence, the Court has taken account not only the guidelines but other sentencing goals.  Specifically, the Court has considered the guideline sentencing range established for the applicable category of offense committed by the applicable category of defendant, and the Court, after careful consideration of the circumstances in this case, does not believe that the punishment set forth in the guidelines is appropriate for this offense.  The Court has carefully considered the kinds of sentences and ranges that the guidelines established, and the Court believes for the reasons stated on the record at the hearing and set forth below that a variance is warranted, because the Court finds the guideline range is inappropriate in this case when it balances the factors in 18 U.S.C. §3553(a).

The Court has no wholesale disagreement U.S.S.G. § 2G2.2.  The Court nonetheless believes that U.S.S.G. § 2G2.2 often produces harsh sentences.  Compared to sentences the Court imposes for other crimes the United States Code prohibits -- <u>e.g.</u>, involuntary manslaughter, illegal reentry, cocaine trafficking -- the Court thinks that U.S.S.G. § 2G2.2 produces extraordinarily high sentences.  The severe sentences imposed for crime involving child pornography reflect Congress' deep concern with these crimes, and a district court should not lightly disregard or put aside Congress' expression of its concerns.  The Court should, however, look at the individual who is before the Court to determine if the guidelines' sentence is appropriate.

-23-

The Court believes that a variance is appropriate here.  While Jager does not fall outside of the heartland of cases, his military service is relevant to granting him a variance.  His service, with the exception of this crime, has been superior and uniformly outstanding.  In his military service, Jager appears to have been trustworthy, and dedicated, and he served with distinction.  His colleagues and commanders wrote on his behalf, commenting on his integrity and good work ethic.  He made a career of the military, rather than serving one or two terms.  These considerations counsel the Court to vary downward.  The Court realizes he has brought shame upon the military with his crime, but with the exception of his crime, he has served with honor, and the Court thinks his service justifies a considerable variance from the guideline sentence.

On the other hand, the Court also agrees with the United States that risk factors are present which do not support a variance down to 36 months.  The United States asks the Court to impose a sentence of 78 months at the low end of the guideline range.  Although the Court does not think a sentence in the guideline range is appropriate here, it also thinks a variance to 36 months is not warranted.

Possession of child pornography cases are serious matters.  Moreover, the Court does not believe that this crime is merely a possession case.  Despite his recantation, the Court believes that Jager's admission that he engaged in sexual activity with underaged prostitutes in South Korea and Germany presents a risk factor.  The Court is also concerned about the extent of his contact with his niece.  Jager has not been truthful with investigators, Dr. Aubrey, and/or his girlfriend, and the Court is concerned that Jager's dishonesty creates a further risk that he will reoffend.  The Court does not think that the full extent of Jager's danger to the community is presently known, but it does not have any disagreement with Dr. Aubrey's suggestion that Jager presents a low to moderate risk.  Because of this risk, the Court does not believe a 36 month sentence, at the low end of the agreement that

Jager reached with the United States, is appropriate.

The Court does not have, as Dr. Aubrey proposes in his report, the luxury of awaiting treatment to determine the extent of Jager's offense and whether he is a hands-on offender -- the Court must make some judgment about these issues at sentencing to protect the public.  As Dr. Aubrey's testimony makes clear, it is difficult to predict recidivism.  There is, consequently, uncertainty surrounding Jager's potential to reoffend.  The Court believes that uncertainty weighs in favor of protecting society, and so this risk works against Jager.

The Court is reluctant to vary too much from Congress' expression of its condemnation of crimes involving child pornography, because society, and men in particular, must learn that child pornography is not a victimless crime, and that possessing these images and reviewing these images creates demand -- it fuels this cruel industry.  These pictures are increasingly violent and the segment of society that is looking at these images is creating a demand that society must take seriously, and courts must not undercut Congress' expression of its deep concern about this problem. These victims are an age where they effectively do not have a choice in these matters, and society must protect these minors and must protect them strongly.

Moreover, if the Court varies from the guideline sentence, it begins to run the risk of unwarranted disparity among sentences, and so the Court must be careful that, when it varies, it varies for good and sound reasons.  The Court has over the last weeks carefully reviewed the sentencing tables in this case.  The Court thinks that the United States not pursuing a crime with a mandatory minimum indicates there are problems with this case.  The Court also thinks that Congress, by setting a mandatory minimum 60 months for receipt and/or distribution of a visual depiction of a minor engaged in sexually explicit conduct, under §§ 2252(a)(2), 2252(b)(2) and 2256, and then having for this crime a guideline range that is higher than the 60 month minimum

creates some tension.  And so the Court is concerned about a sentence that is in that 60-month range.

If Congress had wanted that sentence, it could have imposed that sentence as a statutory minimum.

For these reasons, the Court believes a variance downward, treating Jager's offense level like

an offense level 23, produces a more appropriate sentence in this case.  The Court need not disagree

with how Congress came up with its range, but it thinks that the military service in combination with

Jager's lack of criminal history and the possibility of treatment support a variance down to a range

of 46 to 57 months.  On the other hand, the incidents in Germany and South Korea and with his

niece, combined with the unpredictability of his future dangerousness suggest that treating Jager's

offense level like an offense level 19 -- 30 to 37 months -- is inappropriate, and the Court concludes

that these additional factors point to something higher, and so the Court believes that treating Jager's

offense level like an offense level 23 with a range of 46 to 57 months is appropriate.  The Court

further believes that, under the parsimony clause, a sentence at the low end of that guideline range

of 46 months is an appropriate sentence.  The Court believes that a sentence of 46 months is enough

to reflect the seriousness of this offense.  While it is a considerable variance, the sentence will

promote respect for the law when people see Jager's military record.  The Court thinks this sentence

provides a more just punishment, particularly given his military record.  The Court thinks it will

afford adequate deterrence above the 36 months, because of the risk factors that he presents and for

the same reasons protects the public.

Moreover, the Court will impose lifetime supervised release with conditions that will prevent

further Jager's further consumption of child pornography -- including conditions restricting his

contact with children and his access to computers -- and provide treatment for Jager's addiction to

child pornography.  Lifetime supervision justifies the Court imposing less incarceration.  The Court

thinks a 46-month sentence will provide Jager with the needed education and training and care to

overcome the problems that he has, and implement some of the treatment that Dr. Aubrey recommended. The Court thus finds that a sentence of 46 months adequately reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, protects the public, and otherwise fully reflects each of the factors embodied in 18 U.S.C. § 3553(a). While the Court's task, as a district court, is not to arrive at a reasonable sentence -- it is to come up with one that reflects the factors in 18 U.S.C. § 3553(a), see United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).")(citation omitted) -- the Court believes this sentence is reasonable.

Therefore, as to Count 1 of the Indictment, Jager is committed to the custody of the Bureau of Prisons for a term of 46 months. The Court recommends that Jager participate in the Bureau of Prisons sex offender program. Jager is placed on supervised release for a term of life. The reason the Court imposes a lifetime supervised release is, in part, because the Court varied downward considerably, and the public still needs protecting. The Court varies because it is banking upon the fact that Jager can be treated. The Court wants that treatment to be a serious component of the of the sentence. While the Court is varying considerably, because of Jager's military record, the Court has also recognized that there are risks, and the Court believes that to somewhat mitigate the risk to society a term of supervised release for a term of life is appropriate. Lifetime supervised release, therefore, is a central component of the Court reaching its decision that a substantial variance is appropriate.

III.    **THE COURT DENIES JAGER'S REQUEST TO SELF SURRENDER.**

The United States contends that the crime of possession of child pornography is a crime of

violence which meets the criteria of §§ 3142(f)(1)(A) and 3143(a)(2) to justify immediate detention of Jager upon sentencing.  The United States further contends that Jager is a danger and that there are no exceptional circumstances that warrant releasing him after sentencing in this matter.  The United States asserts that Jager is a danger to the community because: (i) he committed a crime of violence, as defined under 18 U.S.C. § 3156(a)(4)(C); and (ii) because the possession of child pornography is a serious crime, because, among other things, it promotes victimization of children, both when the child is forced to participate in producing sexually explicit images and each time an individual views the images.  The United States also asserts that Jager has an ongoing and longstanding sexual interest in children.  The United States points to Jager's statement to Kirtland Air Force Investigators that he was "addicted" to child pornography and that he consumed child pornography without detection for years.  PSR ¶¶ 9-16, at 4-6.  The United States further asserts that Jager's statements to investigators that he hired child prostitutes and that he was aroused by having his niece sit on his lap demonstrate his dangerousness.

The United States further contends that Jager does not have exceptional circumstances to justify his continued release after sentencing, because Jager's circumstances are unremarkable.  The United States asserts that his circumstances are no different from other child pornography offenders who have been ordered into custody at the time of plea or sentencing.  The United States asserts that neither participation in treatment or tending to personal affairs amount to exceptional circumstances. The United States also asserts that Jager's military record does not justify finding exceptional circumstances to warrant his continued release, because he engaged in child-pornography-related conduct for years while serving in the military.

Jager contends that he does not present a danger to the community or a flight risk, and that his circumstances are exceptional.  Jager notes that, on June 3, 2010, he was released pending trial

on terms and conditions including travel restrictions, prohibitions on the use of computers at home and on access to the internet from any computer, provisions for the search and monitoring of his computer, prohibitions on obtaining, viewing, or possessing any sexually explicit material, together with standard conditions of release.  Jager asserts that he has faithfully abided by those conditions to date -- other than failing to timely report motor vehicle citations for having an expired license plate and no proof of insurance, which were dismissed on September 15, 2010 after Jager showed proof of registration and insurance.

Jager also asserts that his case presents exceptional circumstances that justify his continued release on conditions to afford him the opportunity to voluntary surrender.  Jager notes that he has no prior criminal convictions or arrests.  He also contends that he complied with investigators when they approached him on September 15, 2009, disclosing his involvement with chid pornography, allowing the investigators to search and seize his computer, and admitting that he had received and stored child pornography on his computer.  Jager notes that the United States, after searching and seizing Jager's computer on September 15, 2009, did not indict Jager until May 26, 2010, which Jager contends indicates that the United States does not consider Jager to be dangerous or a flight risk.

Jager also points out that, on his own initiative, he voluntarily underwent a comprehensive sex offender evaluation by Dr. Aubrey.  Dr. Aubrey's report concluded that Jager can be safely placed on probationary supervision, and he opined that Jager's risk level is lower than the majority of sex offenders who are on probationary supervision, either through the United States District Courts or the state district courts.  Jager further contends that he planned to voluntarily begin counseling, although he would be unable to begin counseling until December 16, 2010, because of scheduling and resource constraints.

A final consideration that Jager presents in support of the Court's finding exceptional circumstances justifying allowing Jager to self-surrender is the implications the Court's decision may have on his eligibility for lifelong disability because of his military service.  In April or May of 2010, Jager submitted paperwork for a medical separation from the Air Force because of chronic back injuries.  See PSR ¶¶ 57-58, at 18-19.  Jager represents that a Kirtland Air Force Base Medical Evaluation Board has recommended that Jager not be retained on active duty because of his back injuries, and that recommendation is now under review at Randolph Air Force Base in Universal City, Texas, which is the Air Force's decisional authority for medical separations.  Jager asserts that, if he is approved for separation from the Air Force on medical grounds, he may be eligible for lifelong disability benefits pending a determination of a disability rating.  If, however, Jager is taken into custody immediately after sentencing, the determination of the Randolph Air Force Base Medical Evaluation Board will be rendered moot, and Jager will be ineligible for a disability rating and lifelong disability benefits.  Although Jager has already been recommended for discharge from the Air Force based on this proceeding, Jager's prior application for medical separation takes precedence over administrative separation on other grounds.  Jager thus asserts that he is still eligible for Veteran's Administration medical benefits and disability benefits until he is taken into custody after sentencing.

The Court finds that Jager should be immediately detained upon sentencing.  Section 3143(a)(2) of Title 18 of the United States Code provides:

> The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless –
>
> > (A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or

(ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and

(B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3143(a)(2).  This statutory provision applies to offenses falling under 18 U.S.C. § 3142(f)(1)(A), which includes "crime[s] of violence."  18 U.S.C. § 3142(f)(1)(A).  Under 18 U.S.C. § 3156(a)(4)(C), the term "crime of violence" is defined to include "any felony under Chapter . . . 110."  18 U.S.C. § 3156(a)(4)(C).  Chapter 110 is titled "Sexual Exploitation and Other Abuse of Children" and includes sections 2251 to 2260A, which includes the Count 1 of Jager's Indictment -- Receipt and/or Distribution Of A Visual Depiction of A Minor Engaged in Sexually Explicit Conduct, in violation of 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2) and 2256.

Once a court finds that a defendant meets the criteria of § 3143(a)(2), a court may order a defendant's release if a court finds that the defendant is not a danger and there exists exceptional circumstances to justify release.  See 18 U.S.C. § 3145(c); United States v. Peterson, 185 F.3d 875 (10th Cir. 1999); United States v. Kinslow, 105 F.3d 555 (10th Cir. 1997)(stating that a defendant who sought release pending sentencing for a crime of violence must show by clear and convincing evidence that he was "not likely to flee or pose a danger to any other person or the community" and "making a clear showing of exceptional reasons why his detention would not be appropriate").  Section 3143 does not define "exceptional reasons."  Exceptional circumstances means "being out of the ordinary: uncommon, rare."  United States v. Wages, 271 F. App'x 726, 727 (10th Cir. 2008).  See United States v. DiSomma, 951 F.2d 494, 497 (2nd Cir. 1991)(stating that exceptional circumstances are "a unique combination of circumstances giving rise to situations that are out of the ordinary," and finding that a defendant's status as a student, as employed, or as a first-time offender did not constitute exceptional circumstances).  "A wide range of factors may bear upon the

analysis." United States v. Garcia, 340 F.3d 1013, 1018 (9th Cir. 2003).

The Court finds that Jager is a danger.  While Jager has no criminal history, whatever force this fact may have is undercut by Jager's admissions that he had long consumed child pornography without detection.   In United States v. Wages, the Tenth Circuit noted it is not unusual for defendants in child-pornography-related cases not to have a criminal record.  See 271 F. App'x at 728 (citing United States v. Lea, 360 F.3d 401, 403-04 (2d. Cir. 2004)).  Moreover, the Court credits Jager's admission that he hired child-prostitutes and had contact with his niece that he found sexually gratifying.  Because Jager has long engaged in criminal activity, his ability to escape detection does not induce the Court's favor.

Jager also admits that he is addicted to chid pornography.  See PSR ¶ 16, at 6.  The Court is concerned about Jager's addiction, combined with the difficulty of detecting the consumption of chid pornography and with Jager's demonstrated ability to view chid pornography undetected. Jager's addiction may mean that, if he is allowed to voluntarily surrender, he may -- despite his genuine, rationale intent otherwise -- be compelled to consume chid pornography before surrendering himself.

Given that the Court finds Jager was more than just a possessor and that he has not been honest about the extent of his activities, he creates an uncertain risk, the full extent of which is unknown to the Court.  Dr. Aubrey states that Jager presents low to moderate risk, and he is not willing to say it is a low risk.  Dr. Aubrey also conceded that an offender's likelihood of recidivism is difficult to predict, and this uncertainty weighs against a finding that there is clear-and-convincing evidence that Jager is not a danger to the community.

The Court also finds that Jager's situation does not present exceptional circumstances to justify his continued release after sentencing.  Jager's participation in treatment is unexceptional.

See United States v. Wages, 271 F. App'x at 728 (10th Cir. 2008)(citing United States v. Brown, 369 F.3d 992, 993 (8th Cir. 2004)(stating that participation in treatment was not exceptional); United States v. Rodriguez, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999)(noting that treatment is available in prison)).  Jager's lack of a criminal history is not an exceptional circumstance.  See United States v. Wages, 271 F. App'x at 728 (citing United States v. Lea, 360 F.3d 401, 403-04 (2d. Cir. 2004)).

Because the Court believes that Jager is a danger to the community and he does not present exceptional circumstances, the Court grants the United States' United States' Motion to Order the Defendant Into Custody at the Time of Sentencing, and denies Jager's Motion for Post-Sentencing Release to Permit Voluntary Surrender, Jager's Supplement to Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender, and Jager's Second Supplement to Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender.

**IT IS ORDERED** that: (i) the United States' Motion to Order the Defendant Into Custody at the Time of Sentencing, filed November 23, 2010 (Doc. 33), is granted; (ii) the Defendant's Motion for Downward Sentence Departure Pursuant to U.S.S.G. 5H1.11, filed November 24, 2010 (Doc. 35), is denied; (iii) the Defendant's Motion for Downward Sentence Variance, filed November 24, 2010 (Doc. 36), is granted in part and denied in part as set forth in this Memorandum Opinion and Order; (iv) the Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender, filed November 24, 2010 (Doc. 37), is denied; (v) the Defendant's Objections to the Pre-Sentence Report and Sentencing Memorandum, filed November 24, 2010 (Doc. 38), is granted in part and denied in part as set forth in this Memorandum Opinion and Order; (vi) the United States' Sentencing Memorandum and Recommendation, filed December 1, 2010 (Doc. 39), is granted in part and denied in part as set forth in this Memorandum Opinion and Order; (vii) the Supplement to Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender, filed December

7, 2010 (Doc. 41), is denied; (viii) the Second Supplement to Defendant's Motion for Post-Sentencing Release to Permit Voluntary Surrender, filed December 9, 2010 (Doc. 42), is denied; and (xi) the Court sentences Jager to a term of 46 months in the custody of the Bureau of Prisons followed by lifetime supervised release.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
Charlyn E. Rees
  Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Darrell M. Allen
Albuquerque, New Mexico

      *Attorney for the Defendant*